

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-21-00213-CV

———————————————

IN THE MATTER OF Z.M.

---

On Appeal from the 323rd District Court
Tarrant County, Texas
Trial Court No. 323-115441-21

---

Before Kerr, Birdwell, and Bassel, JJ.
Memorandum Opinion by Justice Bassel

**MEMORANDUM OPINION**

Z.M., a juvenile alleged to have committed capital murder, contends in a single issue that the juvenile court abused its discretion by waiving its original jurisdiction and transferring the case for criminal proceedings against appellant in the criminal district court. Because we hold that the trial court did not abuse its discretion, based on the seriousness of the alleged offense in light of appellant's chance of rehabilitation through the juvenile system, we affirm the trial court's order.

## I.  Governing Law and Standard of Review[1]

Family Code Section 54.02 sets forth the findings a trial judge must make to waive jurisdiction over a juvenile proceeding and transfer the case to the criminal district court:

> (1) the child is alleged to have violated a penal law of the grade of felony;
>
> (2) the child was:
>
> > (A) 14 years of age or older at the time [of the alleged offense], if the offense is a capital felony . . . , and no adjudication hearing has been conducted concerning that offense; [and]
> >
> > . . . .
>
> (3) after a full investigation and a hearing, the juvenile court determines that there is probable cause to believe that the child before the court committed the offense alleged and that because of the seriousness

---

[1]Because we set forth the relevant facts in detail in our analysis of appellant's sole issue, we dispense with a brief introductory background.

of the offense alleged or the background of the child [or both] the welfare of the community requires criminal proceedings.

Tex. Fam. Code Ann. § 54.02(a); *see id.* § 51.02(2) (defining "child" as "a person who is . . . ten years of age or older and under 17 years of age"). The State must persuade the juvenile court by a preponderance of the evidence that the community's welfare requires the transfer, either because of the seriousness of the offense or the child's background, or both. *In re A.K.*, No. 02-20-00410-CV, 2021 WL 1803774, at *19 (Tex. App.—Fort Worth May 6, 2021, pet. denied) (mem. op.).

In making the determination required by Section 54.02(a)(3), the juvenile court must consider, among other matters, (1) "whether the alleged offense was against person or property, with greater weight in favor of transfer given to offenses against the person"; (2) the child's sophistication and maturity, as well as his record and previous history; and, finally, (3) whether the "use of procedures, services, and facilities currently available to the juvenile court" will adequately protect the public and be likely to rehabilitate the child. Tex. Fam. Code Ann. § 54.02(f). These nonexclusive factors facilitate the juvenile court's balancing of the alleged offender's "potential danger to the public" with his "amenability to treatment." *A.K.*, 2021 WL 1803774, at *19. Any combination of these criteria may suffice to support a waiver of jurisdiction; not every criterion need weigh in favor of transfer. *Id.* The juvenile court need not consider any other factors, nor need it find that the evidence establishes each factor. *Id.* "A juvenile transfer order entered after the required transfer hearing and complying with the

3

statutory requirements constitutes a valid waiver of jurisdiction even if the transfer order does not contain factually-supported, case-specific findings." *Id.* (quoting *Ex parte Thomas*, 623 S.W.3d 370, 383 (Tex. Crim. App. 2021)).

We review a transfer order using two steps: first, we review the trial court's Section 54.02(f) findings using a traditional evidentiary-sufficiency review;[2] second, we review the overall waiver decision for an abuse of discretion. *Id.* at *18. Here, appellant appears to challenge the sufficiency of the evidence supporting only two of the trial court's findings: "that the likelihood of reasonable rehabilitation of [appellant] by the use of procedures, services, and facilities currently available to the Juvenile Court is low" and that "it is contrary to the best interests of the public to retain jurisdiction." Appellant contends the evidence establishes the opposite of both findings.

In deciding whether the trial court abused its discretion in making the ultimate decision to waive jurisdiction and transfer the case—whether it erred to conclude that the seriousness of the offense alleged or the background of the juvenile or both called for criminal proceedings for the welfare of the community—we simply ask, in light of

---

[2]Evidence is legally insufficient only when (1) the record bears no evidence of a vital fact, (2) the rules of law or of evidence bar the court from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a mere scintilla, or (4) the evidence establishes conclusively the opposite of a vital fact. *Shields v. Ltd. P'ship v. Bradberry*, 526 S.W.3d 471, 480 (Tex. 2017). We may set aside a finding for factual sufficiency only if, after considering and weighing all the pertinent record evidence, we determine that the credible evidence supporting the finding is so weak, or so contrary to the overwhelming weight of all the evidence, that the finding should be set aside and a new trial ordered. *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986) (op. on reh'g).

4

our own analysis of the sufficiency of the evidence to support the Section 54.02(f) factors and any other relevant evidence, whether the juvenile court acted without reference to guiding rules or principles. *Id.* A juvenile court abuses its discretion when its transfer decision is essentially arbitrary, given the evidence upon which it was based. *Id.* By contrast, a waiver decision representing "a reasonably principled application of the legislative criteria" generally will pass muster under this standard of review. *Id.*

## II. Evidence Relevant to Statutory Findings

Because appellant does not challenge the existence of probable cause, we need not detail the evidence concerning the crime other than to say that the police obtained evidence that appellant, along with another juvenile, allegedly planned a night-time robbery in an apartment complex; located and followed the victim to a darkened passageway inside the complex; held her at knifepoint while attempting to empty her pockets to find her car keys; and knocked her to the ground, after which appellant allegedly stabbed her in the neck. Appellant and his co-actor allegedly fled to the apartment complex where appellant lived and, from there, concealed themselves for five days and arranged to obtain fake identification and go into hiding in a different location. Appellant was fourteen at the time and already on juvenile probation for evading arrest, unauthorized use of a vehicle, and burglary of a vehicle.

Appellant's Tarrant County Juvenile Services probation officer testified about appellant's prior involvement in the juvenile system. He said that appellant first committed the evading-arrest and unauthorized-use-of-a-vehicle offenses and that

officers had seized a knife from appellant in connection with the unauthorized-use offense. Appellant was offered the opportunity to participate in the Tarrant County Advocate Program (TCAP), but he never started because the COVID-19 pandemic affected the program's availability. In July 2020, appellant reoffended by committing the burglary of a vehicle. As a result, his probation was extended, and he was ordered to participate in another program, through the Tarrant Youth Recovery Center (TYRC).

TYRC provides a treatment program for substance abuse. Appellant, a marijuana user, was in the residential treatment program for two months and in outpatient treatment afterward; he did not complete the outpatient treatment successfully. Appellant admitted to his probation officer that while in the program, he was just going through the motions.

According to appellant's probation officer, appellant was not able to physically report or take a drug test during the pandemic. Instead, he met with his probation officer virtually three times a month. Appellant's mother was also available for virtual meetings, and she had a positive attitude. Likewise, the probation officer's interactions with appellant's family were "[v]ery positive, very cooperative." COVID restrictions also prevented appellant from taking an anger-management class.

Appellant's aunt had said she felt she could be responsible for appellant and supervise him at home. But appellant did not have a steady home life. He moved back and forth between his mother's apartment and his aunt's apartment in the same

6

complex, at his own discretion. His aunt was not as strict as his mother, but although appellant liked that, he knew it was bad for him.

Appellant was attending school virtually during the pandemic. His field officer assessed his intelligence as "average."

While in detention for the alleged capital murder, appellant had once been verbally abusive toward staff and had some negative interaction with peers but had also stayed at a level one "outstanding" behavioral rating for most of the 110 days he had been detained.

Appellant's probation officer testified that in similar cases, he would have recommended resource staffing—which appears to consist of a committee that explores the various programs and services available and most appropriate for the juvenile—but in this case, the trial court had instructed him not to do so. He agreed that violent offenders are not categorically excluded from resource staffing. But appellant's probation officer agreed that, even without resource staffing, there were still juvenile services available that appellant could benefit from.

Based on details about how the capital murder was executed and planned, appellant's probation officer opined that appellant was more sophisticated than other fourteen-year-olds he had dealt with and that, based on his personal experience with juvenile services, he could not think of any juvenile-department program that would give appellant a chance of rehabilitation. But he also said he could try to look for a program "that could target [appellant's] emotions, social skills[,] and the wrongdoing

on any offense he is found guilty of." Appellant's probation officer believed that "with [appellant's] young age and the services that juvenile can provide[,] that juvenile [could] rehabilitate" appellant and that keeping appellant in the juvenile system would protect the public.

A juvenile-services probation officer who had not supervised appellant discussed the various programs available within the department, primarily involving family engagement. TCAP, for instance, provides trained adult mentors to high-risk youth, helps them find employment, and engages them in prosocial activities. She also talked about the general availability of mental-health services and drug-treatment options.

Appellant's PACT[3] report showed a high risk of reoffending, with a moderate criminal history.

Dr. Emily Fallis, a clinical psychologist who evaluated appellant, opined that lack of structure was a problem in appellant's life. She also noted that appellant told her his mother had been "physical" when punishing him, including hitting him with a phone book, and that there was no father in the home. According to Dr. Fallis, physical abuse in childhood can cause someone to act out in a violent manner. She agreed that appellant was at an age "when kids don't really know how to cope with things." She listed multiple services in the Tarrant County juvenile system that "have programs to address these children that do not have a father figure at home and have abandonment

---

[3]PACT stands for Positive Achievement Change Tool. *A.K.*, 2021 WL 1803774, at \*3.

8

issues": Big Brothers Big Sisters; family intervention; individual and group therapy; and gang intervention, to name a few. She thought appellant could benefit from such programs. Dr. Fallis also opined that programs exist that can help "somebody that has been physically abused and acted out violently be rehabilitated" and that the recidivism rate goes down when someone who has been physically abused attends counseling.

According to Dr. Fallis's evaluation, appellant was detached from relationships and had an overly positive view of himself, both of which she considered protective mechanisms. She thought more treatment options would be available to him in the juvenile system than the adult system and thought he could benefit from the available options. She thought appellant's risk of harming others was low "given that . . . what he faces right now are still alleged offenses." But on cross-examination, Dr. Fallis admitted that in completing her evaluations, she does "not use information from a police report in a crime that has not yet gone to court, whether it be a[] juvenile or an adult." Thus, she did not consider the alleged capital murder in considering her evaluation of risk.

Overall, Dr. Fallis opined that appellant's "age at the time of the alleged offenses and early childhood stressors," as well as his "amenability to treatment," were reasons "to consider keeping him in the juvenile system"

## III. Analysis and Conclusion

Our review of the record shows that the evidence pertinent to the challenged Section 54.02(f) findings is sufficient. Although some evidence contradicts the trial

court's findings—such as Dr. Fallis's testimony that appellant is at a low risk to reoffend and that he could benefit from some juvenile services, especially therapy—the evidence supporting the findings is not exceptionally weak, nor is the conflicting evidence overwhelming. No person was able to testify to specific programs available to assist in rehabilitating appellant in light of the heinousness of the crime. And the evidence showed that appellant allegedly committed this "worst crime possible," in the judge's words, less than a year after first entering the juvenile system; in that short time, he had committed three other crimes and had carried a knife during one of them. Despite appellant's participation in a two-month residential and subsequent intensive outpatient drug-treatment program, juvenile-services intervention had not prevented appellant's alleged participation in a more serious offense than his prior ones. Finally, the State presented at least some evidence that appellant stabbed the victim after she was already on the ground, and while he and the other juvenile were leaving the scene, either because he got angry when they could not find her keys or because he did not want her to be able to identify him. We hold this evidence to be legally and factually sufficient to support the trial court's finding "that the likelihood of reasonable rehabilitation of [appellant] by the use of procedures, services, and facilities currently available to the Juvenile Court is low" and that "it is contrary to the best interests of the public [for the trial court] to retain jurisdiction."

Additionally, we hold that the trial court did not abuse its discretion by deciding to waive its jurisdiction and transfer the case to the criminal district court. After a two-

day hearing at which the evidence detailed above was elicited, the State focused its closing argument exclusively on the heinousness of the crime, contending that "[t]he juvenile system is not made to rehabilitate this behavior" and that appellant would have only until his nineteenth birthday—a relatively short time—in the juvenile system to participate in any potentially rehabilitative services. In announcing its decision, the trial court pointed out that although appellant had been at low risk for his previous offenses, "there is no other way to escalate" the crime with which he is charged. The trial court thus expressed concern that if appellant were to continue within the juvenile system, "somebody else will die."

The nature and seriousness of the specific alleged offense, alone, may justify the juvenile court's waiver of jurisdiction "notwithstanding other section 54.02(f) factors, so long as the offense: (1) is substantiated by evidence at the transfer hearing, and (2) is of sufficiently egregious character." *Matter of M.A.T.*, No. 13-18-00295-CV, 2018 WL 5289550, at *7 (Tex. App.—Corpus Christi–Edinburg Oct. 25, 2018, no pet.) (mem. op.); *see also, e.g.*, *Matter of S.T.*, No. 04-18-00133-CV, 2018 WL 5927983, at *6 (Tex. App.—San Antonio Nov. 14, 2018, pet. denied) (mem. op.). Here, the evidence suggested that although the actual murder was impulsive, the underlying robbery was allegedly carefully planned for the sole purpose of stealing the victim's car while evading detection and—even without considering the murder—was carried out without regard to the victim's welfare. Moreover, appellant allegedly committed the offense after what appears to be a pattern of escalating behavior. Accordingly, we cannot say on these

facts that the trial court abused its discretion by deciding, in its discretion, to waive its jurisdiction and transfer the case to the criminal district court.

We overrule appellant's sole issue and affirm the trial court's order.

/s/ Dabney Bassel

Dabney Bassel
Justice

Delivered: October 21, 2021